UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

DENNIS CHADWICK MCGEE, as
Personal Representative/Administrator of
the Estate of DILLON C. MCGEE,
deceased,

        Plaintiff,

v.

MADISON COUNTY, TENNESSEE; et al.

        Defendants.

No. 1:15-cv-01069-JPM-egb

**JURY DEMANDED**

**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PARTIAL MOTION FOR SUMMARY JUDGMENT**

Comes now Plaintiff, individually and through Counsel, and respectfully files this Statement of Material Facts in Support of his Motion for Summary Judgment and would state as follows:

**Actions of Thomas Knolton**

1. Madison County Sheriff's Office ("MCSO") deputy Thomas Knolton ("Knolton") shot and killed Dillon McGee on September 26, 2014. (Cpl. ¶ 9; Knolton, 7:10-12, 28:17-20, 374:21-25).[1]

2. At all times relevant to this case, Knolton was acting in the course and scope of his employment with the MCSO. (Cpl. ¶ 9). Both the Sheriff of Madison County and the Madison County designated representative on training have testified that Knolton's conduct on

---

[1] Plaintiff submits these facts for the purposes of this motion for partial summary judgment only. Plaintiff reserves the right to present additional facts and/or evidence in response to a dispositive motion filed by one or more of the defendants and/or at trial.

the day of the shooting was consistent with his training. (Holland, 167:6-25; Mehr, 132:20-133:9).

3.  On September 26, 2014, Knolton and Deputy Terry Stewart were serving an arrest warrant on Dillon McGee ("Dillon") at the Maverick Convenience Store in Madison County, Tennessee (Knolton, 131:7-11, 357:6-9).

4.  Knolton only had evidence of a simple assault misdemeanor, at most, committed by Dillon McGee prior to serving this warrant and he knew nothing about Dillon other than what he had learned in his investigation. Knolton understood that all Dillon had committed was a misdemeanor at most when he pulled up to serve the warrant. (Knolton, 27:1 - 28:24; 59:6-23; 145:7-10; 215:20–216:4).

5.  Knolton did not believe that he was attempting to arrest a felon when arresting Dillon. (Knolton, 139:1 -145:20).

6.  Knolton was doing what has been referred to as a "hard take down" on Dillon at the convenience store (Knolton, 323:12-14; Stewart, 67:7-9, 79:17 – 80:2).

7.  Dillon and a friend were lawfully parked in the parking lot of the convenience store when Knolton pulled up to serve the warrant (Knolton, 133:3-16, 357:6-9).

8.  Knolton and Stewart were in an unmarked car, were not in a uniform, and did not activate their emergency lights or sirens when they pulled their vehicle in front of Dillon's vehicle. Knolton jumped out of his car with gun drawn and pointed it at Dillon. Stewart testified that Dillon turned the steering wheel hard right and drove his car in the general direction of Knolton and that Knolton then fired shots through the windshield in close proximity to Dillon. (Knolton, 111:16-22, 306:7-23, Knolton, 319:21-24; Stewart, 79:17 – 80:2, 80:23 – 81:4, 84:18-25, 152:3-15).

9. Knolton chose to pull his car up, in plain clothes, not put on his patrol lights, to jump out, fully extend his arms with a gun pointed at the car while only yelling, "hands, hands, hands" and not identifying himself as an officer. (Knolton Depo, 148:6-16; 217:1-7; 266:14-21; 277:16-17; *See* Exhibit 15 to Knolton Depo photo of Knolton).

10. These shots through the windshield entered at such an angle that the conclusive forensic evidence confirmed that Knolton was not directly in front of Dillon's car and that he was never in the trajectory of the moving vehicle when he fired these two shots or the subsequent ones that he fired from the side of the vehicle. (Noedel Aff. ¶¶5,6; Noedel Aff. Ex. 1, pp. 15-27; Noedel Depo, 94-95, 115, 131-132). Neither of the shots through the windshield struck Dillon. (Knolton, 39:21-24).

11. Dillon was turning the vehicle hard right in an attempt to exit the parking lot from the start of this incident. (Stewart, 115:5-14; 118:4-7; Knolton 329:6-9).

12. Knolton followed the moving vehicle some 23 feet while firing three more shots into the driver's window after the front of the car passed by him. The fifth and final shot killed Dillon and was fired from an approximate 90 degree angle into the driver's side window. (Noedel Aff. ¶¶ 5 & 6; Noedel Aff. Ex1, p. 27)

13. Knolton's fatal shot was undisputedly fired from the side of Dillon's vehicle. (Noedel Depo, pp. 94-95; Aspiranti Depo, p. 166; Haynes Depo, pp. 10-12).

14. More than one witness testified that there was a gap between the first two shots and the second set of three shots. (Haynes, p. 8:5-15; Aspiranti, p. 166).

15. Knolton admits that if an officer continued to fire at a person in a moving vehicle after the vehicle has passed and the officer was not in harm's way, it would be excessive force and a violation of the rights of the individual he was shooting at. (Knolton, 166:9-17, 169:19-23).

16. Knolton further admits that if he fired shots after he was no longer directly in front of the moving vehicle, it would be excessive force. (Knolton, 325:24—326:4; 326:8-13).[2]

17. It is clearly established in Knolton's mind that he cannot fire at a moving vehicle after the vehicle has already passed from harm's way and is no longer an immediate threat. (Knolton, 167:16-21).

18. Knolton agrees that he does not have the right to use deadly force the moment he is out of harm's way and if he used deadly force after that instant had passed, it would be excessive and a violation of the constitution. (Knolton, 171:9-23).

19. In Knolton's opinion, he was the only person in harm's way at any point during the shooting and he was not concerned about the safety of anyone else when he fired the shots. He was only shooting in self-defense. (Knolton, 114:22-115:6; 287:19-21; 424:14-17).

20. Knolton agrees this case is all about ballistics and that if the ballistics proof shows that he was at an angle and/or at the side of Dillon's vehicle when he fired into the car and not in front of it, then he was not in harm's way. (Knolton, 320:14-19; Knolton, 322:19-25).

21. According to the uncontroverted ballistics proof, when Knolton was shooting he was never in a position where the vehicle could strike him or run over him. He was alongside the driver's side of the vehicle when he fired the final three shots, with the last one being the fatal shot. (Noedel, 94-95; 115:16-25; Noedel Affidavit).

22. Knolton fired five total shots at Dillon (Noedel Aff, ¶5).

23. The ballistics proof and physical evidence shows that the fifth shot that was fired by Officer Knolton was the fatal shot. (Noedel, 116:2-9; Noedel Affidavit, ¶5).

---

[2] Given the conclusive forensic evidence that Knolton walked some 23 feet before firing the fifth and fatal shot from the side of the car, this admission alone is sufficient to serve as the basis for summary judgment against Knolton.

24. Knolton sidestepped to keep up with Dillon's car some 23 feet after firing the first shot and before firing the fifth and fatal shot. (Noedel Aff. ¶6; Noedel Aff. Ex1, p. 27).

25. Knolton would have been more than 15 feet away from the car when he fired the fatal shot if he had stayed where he was instead of walking to keep up with the vehicle. (Noedel Aff. ¶6).

**Madison County Training, Policy, Insufficient Investigation and Ratification**

26. MCSO did not give any guidance or training on how to serve a warrant, especially on how to block the suspect's vehicle, in a situation where the officer thinks there may be a need to be on high alert. (Knolton, 213:2-25; 214:11-15; 283:4-12).

27. Sheriff Mehr leaves it up to his deputies on how to serve an arrest warrant and he ratified the actions of Knolton and Stewart in this case without second-guessing them. He is not going to second-guess his officer. (Mehr, 123:3-24).

28. The extent of Officer Knolton's training on how to serve a warrant was to do what he thinks is best. (Knolton, 214:11-15; 282:19 – 283:3).

29. Officer Knolton did not receive training on how to a do a hard takedown but it was his intent to block the vehicle so it could not get away. Knolton failed to block the McGee vehicle in and Knolton believes Dillon would not have been killed if he had received training on how to do this maneuver properly. (Knolton, 213:2-25; 275:19-276:6; 283:13-16; 296:15-25).

30. Officer Knolton believes there was not enough training by the MCSO on how to handle situations such as the McGee incident and if there was more in-depth training, there would have been a different outcome. (Knolton, 274:5-15, 275:14-15).

31. Knolton says there was no previous training by the MCSO on what to do in a suspicious or felonious stop when the incident begins to escalate. (Knolton 295:13 – 297:3).

32. The technique that Knolton used was a normal practice for the MCSO, but he never received any training on how to do this technique of jumping out of a car with gun pointed at someone while yelling, "hands, hands, hands" to serve a warrant. (Knolton, 299:16 –300:16).

33. The relevant portion of the MCSO Use of Force policy that was in effect at the time of this shooting is as follows:

> (D). USE OF DEADLY FORCE: A DEPUTY MAY USE DEADLY FORCE ONLY ON TWO OCCASIONS:
>
> 1. TO DEFEND HIS LIFE OR THE LIFE OF ANOTHER PERSON.
>
> 2. TO APPREHEND OR PREVENT THE ESCAPE OF A DANGEROUS FELON, WHEN ALL OTHER REASONABLE MEANS HAVE BEEN EXHAUSTED. A DANGEROUS FELON SHALL BE DEFINED AS A PERSON WHOSE ESCAPE WOULD REPRESENT A SERIOUS DANGER TO THE PUBLIC, AND WHOSE CRIME INVOLVED THE DEATH OR THE USE OF GREAT PHYSICAL HARM, OR THE THREAT OF GREAT PHYSICAL HARM AGAINST THE PERSON OF ANOTHER. THIS SHALL INCLUDE MURDER, AGGRAVATED ASSAULT, ARMED ROBBERY, AGGRAVATED RAPE, AND ARSON OF AN OCCUPIED DWELLING.

(*See* Madison County Sheriff's Department Use of Force policy, Exhibit 9 to Deposition of Thomas Knolton; Lewoczko, 28: 24 – 29:3).

34. The MCSO is not going to second-guess or scrutinize an officer's conduct if the officer has to use deadly force and then says that he was in fear. (Lewoczko, 36: 14-21; Mehr, 136:6-19.[3]

35. Madison County condoned and ratified the actions of Officer Knolton in this case as being consistent with their policies, procedures and training. (Lewoczko, 29:17-20; Holland, 121:9 –122:11; Mehr, 87:7-20; 133:17-24).

36. Under the policy and training of the MCSO, an officer can use deadly force if he feels his life is in danger and can continue shooting after the vehicle has started to drive away

---

[3] Madison County's sole police practices expert testified that the department should second guess and not give the officer the benefit of the doubt with regard to his statement. (Ryan, 92:19 – 93: 1).

and the officer is out of harm's way to keep the vehicle from getting away. (Lewoczko, 29:4-12; 40:17 – 41:21).

37. The MCSO trained its officers that it is acceptable to shoot a fleeing felon in the back as they are driving away if the fleeing felon is suspected of committing one of the enumerated offenses listed in the policy, irrespective of whether the officer is in harm's way or whether anyone else is in harm's way. (Holland Depo, 125:11-24).[4]

38. The MCSO approved of the actions of Officer Knolton and placed him back on duty without even reading the statement of Officer Knolton, without looking at any other statements and without reading the investigative material in this case. (Lewoczko, 52:5 – 53:11; Mehr, 75:23—78:1).

39. The investigation done by the Tennessee Bureau of Investigation ("TBI") was a criminal investigation and not an investigation as to whether department policy or civil rights were violated. (Mehr, 37:16-24, 38:18 – 39:3; Carter, 82:2-24).

40. According to John Lewoczko, Chief Deputy of the Madison County Sheriff's Office, there was not an internal investigation done by Madison County to determine whether Officer Knolton complied with training, policy and procedure. (Lewoczko, 7:4-14).

41. Sheriff Mehr did not believe he needed to do an internal affairs investigation because the TBI did what he believed was a thorough investigation. (Mehr, 66:10-22).

42. Mehr is not concerned that TBI did not do an investigation into whether Knolton complied with the Sheriff's offices policy, procedure and training and he decided no internal investigation needed to be done by the Madison County Sheriff's Office. (Mehr, 67:13-25; 100:7-17).

---

[4] Plaintiff contends that this policy as trained is unconstitutional as a matter of law.

43. Sheriff Mehr believes that officers' statements should be given a different weight than another citizen. (Mehr, 55:9-17).

44. Sheriff Mehr, prior to his deposition, had not read the deposition transcript of Knolton or watched his testimony on video or read his statement to the TBI or read the entire TBI file. (Mehr, 60:11-22, 80:7-15).

45. Mehr did not need to read all of the TBI file or the testimony of Knolton and Stewart to know that this was a justifiable shooting. (Mehr, 80:7-19).

46. Sheriff Mehr never asked Knolton to explain why he shot each shot that he fired and he did not feel that was necessary because he felt like the evidence at the scene and Officer Knolton's word were enough. (Mehr, 79:13-22).

47. Sheriff Mehr decided early on, without talking to investigators, that he would put Knolton back to work as soon as possible. (Mehr, 81:20 – 82:2).

48. Sheriff Mehr completely ratified and approved how Officer Knolton obtained the warrant in this case, how he served the warrant, and his use of deadly force in this case. (Mehr, 86:19 – 87:4).

49. Sheriff Mehr completely ratified the conduct of Knolton in this case, including the decision to serve the warrant by pulling up and jumping near the front of Dillon's vehicle, without backup, without blue lights, without being in uniform and initially pulling guns and pointing them at Dillon, and he doesn't "have a problem with this case at all." (Mehr, 132:20 - 133:9).

50. Sheriff Mehr neither questioned Knolton on whether he was in fear when he fired the fatal shot nor did he ask Knolton to detail every shot he fired or justify each shot. In fact,

8

neither Sheriff Mehr nor anyone from the MCSO ever questioned Knolton about the details of this case. (Mehr, 135:24 – 136:14; 136:24 – 137:8).

51.     Mehr felt that Knolton was justified in firing the fatal shot that killed Dillon McGee even without questioning Knolton on whether the car was on a trajectory to strike him when he shot and killed Dillon. (Mehr, 136:20-23).

52.     Mehr never asked Knolton why he fired the last three shots through a side window with one going through Dillon's back. (Mehr, 135:14-19).

53.     Sheriff Mehr accepted what Knolton did without second-guessing him and Mehr did not think it was necessary to go behind Knolton to find out the details why he did what he did.  (Mehr, 135:6-13).

54.     Mehr has no problem with the deadly force policy from Madison County that was in place when Knolton shot and killed Dillon McGee. (Mehr, 153:16-17).

55.     Mehr finds the shooting of Dillon McGee justified by Knolton just because Knolton says the car was coming at him. (Mehr, 88:11-16).

56.     Mehr does not have a problem with Knolton shooting Dillon McGee to stop Dillon from escaping even if McGee had turned the car and was attempting to get away because this was a felony warrant for aggravated assault. (Mehr, 88:17-22).

57.     Mehr believes that Knolton was justified in continuing to shoot at Dillon as he was trying to get away to stop the threat that Dillon was to the community because of what Dillon had done in the past. (Mehr, 88:23 – 89:7).

58.     Mehr believes that under the policy an officer can use deadly force to stop the fleeing felon if the felony involves aggravated assault or something worse. (Mehr, 91:19-25).

9

59. Mehr would not have had a problem with it if Knolton would have continued to fire shots to stop Dillon even as Dillon drove away and Knolton was out of harm's way. (Mehr, 104:3-15).

60. The official policy of the Madison County Sheriff's Office as it existed in September 2014 and as it exists today is there are three occasions under the policy when officers may shoot at a moving vehicle. Officers may shoot at a moving vehicle if they believe they are in danger, if they believe someone else is in danger, and to prevent the escape of a violent felon. (Holland, 54:16 – 56:6).

61. There is no training that is provided by the Madison County Sheriff's Office requiring officer to identify themselves as officers before they use deadly force. (Holland, 61:23 – 62:2).

62. There is no training that requires MCSO deputies to warn/announce their intent to use deadly force before they use deadly force. (Holland, 62:3-8; MCSO Use of Force policy).

63. Madison County does not train officers that before they shoot at a moving vehicle the first option should be to jump out of the way if they can. (Holland, 170:12-17).

64. Madison County's position is that use of deadly force laws have not changed since 1990 and they teach the same way since 1990. (Holland, 70:12-20).

65. Madison County, through its designated representative and chief training officer Donald Holland, believes that Knolton acted in compliance with policy and was reasonable because he was shooting in self-defense and then shooting a violent felon who was trying to flee the scene. (Holland, 127:19-24; 128:12-18).

66. Holland says that Knolton, in the service of the warrant and the shooting of Dillon McGee, was reasonable and fully consistent with training and policies even though Holland has

never read Knolton's statement, Knolton's deposition transcript, any of the TBI file, the complaint in this matter, the County's answer or Knolton's answer. (Holland, 167:6-25).

67. Captain Jeff Fitzgerald, the designated representative of Madison County on deputy/officer-involved shootings for the prior six years involving deputies, confirmed that the MCSO has not conducted an internal affairs investigation to determine whether the officers/involved in a shooting complied with policy, procedure, and training in all previous officer involved shootings at the MCSO in the recent past. (Fitzgerald, 7:11-20; 50:7 – 51:23).

68. The only reason that Knolton gives for using deadly force against Dillon McGee was because he was afraid for his life. (Knolton, 273:19-24).

69. An autopsy was performed on Dillon McGee on September 27, 2014, by Dr. Adele Lewis. (Autopsy Report of Dillon McGee, Exhibit 2 to Deposition of Adele Lewis; Lewis, 9:15 – 10:9).

70. Two TBI agents were present to observe the autopsy. Joshua Carter was one of the agents in attendance who said he was there to see of the cause of death matches with the accounts of people who were at the scene. (Lewis, 10:10-16; 11:1-15).

71. When Dr. Lewis was doing the autopsy, they uncovered the decedent and TBI Agent Carter, after seeing the gunshot wound on the right side of the front chest said, "Oh, good, there's a gunshot wound on the front." Carter explained that it was a good thing there was a gunshot wound on Dillon's chest because it was consistent with the story Carter had been told about that Dillon being shot while driving towards a police officer. (Lewis Depo, 12:1-14).

72. The gunshot wound in the chest of Dillon McGee, however, was an exit wound. The entrance wound of this fatal shot was on the left side of his back. (Lewis, 12:15 – 13:4).

73. When Dr. Lewis told Carter, the special agent at the autopsy, that the wound on the chest was an exit wound, Carter said this was not consistent with what he was told the story was. (Lewis, 16:13-22).

74. Michael Parson is a special agent with the TBI assigned to the Jackson field office. (Parson, 5:21 – 6:5).

75. Agent Parson worked for the Jackson Police Department prior to joining the TBI. While working for the Jackson Police Department he worked with Thomas Knolton's twin brother and Thomas Knolton's wife. (Parson, 7:18-24; 154:4-20).

76. Even with these relationships, Parson did not request that someone other than a agent from West Tennessee lead the investigation. Parson does not believe there was a conflict. (Parson, 154:21 – 155:7).

77. Parson was assigned to work on this case and arrived on the scene the day of the shooting but did not attempt to get a statement from Knolton on the day of the shooting. (Parson, 16:4 – 17:25; 18:1-3; 46:2-15; 66:15 – 70:10).

78. Knolton gave a statement to the TBI two days after the shooting because Knolton wanted to wait a couple of days before giving a statement. (Knolton, 96:18 -- 97:18).

79. Parson talked to Robert Aspiranti, the passenger in Dillon McGee's car, on the day of the shooting and then interviewed Asprianti on the evening of the shooting at approximately 8:52 p.m..  (Parson, 19:2-21; 21:11 – 23:17).

80. Parson and Carter testified that at first the statement Aspiranti signed was a typed version of what Aspiranti had said, but later admitted that they did not include everything that Aspiranti told them in this statement they typed up because Parson did not believe him. (Parson, 52:19-24; 81:19 – 82:16).

81. Parson testified that it is his job to ask critical questions to get to the truth (Parson, 110:2-24) but that he did not do that with Knolton because he was an officer. (Parson, 116:11 – 121:17). Parson conceded that he gave Knolton the benefit of the doubt on his statement and did not ask him any critical questions to challenge his story, including how the fatal bullet entered the back from the driver's side window if Dillon was trying to run him over. (Parson, 113:20 – 115:22).

Respectfully submitted,

 /s/ Jeffrey S. Rosenblum
Jeffrey S. Rosenblum, #13626
Matthew T. May #25547
ROSENBLUM & REISMAN, PC
6070 Poplar Avenue, Suite 550
Memphis, TN 38119
(901) 527-9600

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been forwarded to counsel of record through this Court's ECF filing system this the 28th day of August, 2017.

 /s/ Jeffrey S. Rosenblum
Jeffrey S. Rosenblum